UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case Number: 24-mj-119 |
| v. | : | |
| | : | |
| | : | |
| KAZIAH WHITE, | : | |
| | : | Detention Hearing:  April 2, 2024 |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its request that defendant Kaziah White be detained pending trial of this matter pursuant to 18 U.S.C. §§ 3142(f)(1)(A).  Mr. White is charged with Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), and with Travel with Intent to Engage in Illicit Sexual Conduct, in violation of 18 U.S.C. § 2423(b), both of which are defined as "crimes of violence" pursuant to 18 U.S.C. § 3156(a)(4)(C).  Further, there is a rebuttable presumption of detention here, where Mr. White is charged with offense involving minor victims pursuant to 18 U.S.C. § 3142(e)(3)(E).  There is no condition or combination of conditions that will reasonably assure the safety of children in the community – both in the physical world and online – if Mr. White is released.  As detailed below, an analysis of the factors set forth in 18 U.S.C. § 3142 leads to the conclusion that detention is the only way to protect children in the community and to ensure the defendant's future appearance.

**FACTUAL BACKGROUND**

On March 21, 2024, a Federal Bureau of Investigation (FBI) Task Force Officer (TFO) assigned to the Washington Field Office (WFO) was acting in an online undercover (UC) capacity as part of the FBI Child Exploitation and Human Trafficking Task Force (CEHTTF), operating out of a satellite office in Washington, D.C.

In that capacity, the UC was monitoring the dating application, Scruff. The UC maintains a profile on the dating application that indicates the UC is interested in the sexual exploitation of children using child exploitation keywords prominently listed in the UC's Scruff profile page.[1] The UC has hashtags prominently displayed on his account indicating that he is interested child sexual abuse material (CSAM) and child exploitation.

On Thursday, March 21, 2024, at approximately 1320 hours, the Scruff user, EarthenFire✈️MD," messaged the UC's Scruff account via private message and advised, "Fuck yes prv bro…👨‍👦🍕[2]…Would love to meet n play." The UC asked if the user had "Kik or Tele" and the Scruff user advised, "Tele @earthenfire." The term "Tele" is known to be a shorthand for the application "Telegram." The user advised that he was staying in Clarksville, Maryland, "but can travel basically anywhere during the day." The user also unlocked his personal photographs on the Scruff application which included what appeared to be several pictures of an adult white male with a prominent red in color beard.

At approximately 1625 hours, the UC messaged the Telegram user @earthenfire via Telegram direct message and advised, "Dave from scruff." The UC and @earthenfire then

---

[1] These key words are not provided here so as not to compromise future investigations and/or law enforcement monitoring of the application.

[2] The UC knows that the pizza emoji, or "cheese pizza" is frequently used in the child exploitation world as a keyword for child pornography.

engaged in a conversation regarding the sexual exploitation of children to include the sexual exploitation of the UC's purported ten-year-old son. @earthenfire indicated during this conversation that he prefers boys between the ages of "5-14" but is open to younger. @earthenfire advised during this conversation, "Always wanted to find a dad who bonds with his boy" and "come over like a friend from work, and then let son explore us both."

The UC indicated that he was interested in meeting with @earthenfire in person and @earthenfire reported, "Broooo I'm only the area til the end of the month, would love to plan a playdate. We can get lunch somewhere public first if u wanna feel out the vibe. And show u Im not a cop lmfao. Have an after school bonding sesh." @earthenfire indicated "5-14" were his favorite ages and "Always wanted to find a dad who bonds with his boy." The UC asked if he was open to younger ages and @earthenfire advised, "Oh I'm totally open, but just my fave age range."

@earthenfire advised the UC, "Buddy totally legit here, willing to prove it in any way" and then shared screenshots of the Twitter account @ToonGoonBator – Wilderness Bator and the Discord account Earthenfire#0000. @earthenfire advised that Discord is "for chatting." @earthenfire reported, "Also got my own place in Northern NY, would be hot to host y'all for a father son camping trip haha….Def total boy prv here raised right. Love spreading that deep man boy bonding."

The UC and @earthenfire discussed activities they could engage in with the UC's purported son and the UC qualified that there were rules. Specifically, "No blood, no bruises, and no crying" and @earthenfire advised, "Hell yeah I don't get into violence of pain, verrrry passionate and playful and loving here." The UC also reported, "Haven't gotten to fuck him yet, only rub my cock all over his hole..." and @earthenfire advised, "Nah he needs training haha. My step dad and I did toys for months before he finally got to breed me."

The UC and @earthenfire discussed meeting on Thursday, March 28, 2024, and agreed to meet after the UC picked up his purported son from school. The UC asked what @earthenfire would be interested in doing and they advised, "Tbh pretty open, love full body play, kissing, jerking, sucking, looove to lick all over, porn, toys. I've got other goodies like rope and cuffs and stuff if we want to get spicier lol. Fuck so bricked thinking about it buddy."

On March 22, 2024, Discord provided the subscriber information associated with username earthenfire#0000, indicating that the verified email address for that account was kazmwhite@gmail.com. In turn, Google indicated that the email address kazmwhite@gmail.com was associated with the display name "Kaziah White." Both Discord and Google also provided additional information, including IP logs, that resolved to the address of an individual believed to be a relative of the defendant. Law enforcement then made a tentative identification based upon personal photographs shared by @earthenfire000, as compared to other known images of Kaziah White.

On March 22, 2024, at approximately 0428 hours, @earthenfire messaged the UC, "Also had a buddy send some content if u wanna see 😈🤤🍕." At approximately 0755 hours, @earthenfire forwarded twenty (20) videos of child sexual abuse material (CSAM) to the UC. The videos include,

1. A twenty-three (23) second long video of a completely nude prepubescent male being anally penetrated by an adult male's erect penis. The adult male appears to be recording the abuse and the video is watermarked with, "Dark Fantasy."
2. A forty-six (46) second long video of an adult male penetrating the anus of a prepubescent boy with his mouth while the boy is laying on a couch.

4

3. A twenty-four (24) second long video of a completely nude prepubescent male being anally penetrated by an adult male's erect penis.

The UC and @earthenfire continued to discuss the sexual exploitation of the UC's purported son and confirmed again to meet on March 28, 2024, to engage in sex acts with the purported child. The UC indicated that he would want to watch @earthenfire abuse the child and potentially join in. @earthenfire reported that he would be willing to have the child "fuck him" and be used as the child's "sub."

The UC advise @earthenfire that he would begin to prepare the purported child for his visit on Monday and advised that he could "share whatever you want with him" during that process. @earthenfire advised, "yuuuupp all about the bonding and building up excitement….Hell yeessss."

@earthenfire asked the UC, "Would you be able to trade personal pics? Show off our bodies and cocks together? Can quietly vid chat on scruff." The UC advised @earthenfire, "So full disclosure dude. I am bi but I'm pretty fluid with it. Right now I'm very into fucking 20 something's with daddy issues 😂😂😂. Being on here is for my pedo itch cause it seems to be the only place I can meet fellow degenerates safely." @earthenfire reported, "That's fair totally get it haha…Maybe you can find big sis to ride that daddy dick while I take care of that boy. Hehehe def gonna be a good time."

On March 22, 2024, at 0955 hours, @earthenfire stated, "Preview of your view of me with the him in a week 😈😌" and forwarded over twenty (20) additional videos of CSAM to the UC to include a video of an adult male nude from the waist penetrating the mouth of a prepubescent boy with his erect penis while holding the back of the child's head down.

5

The UC advised @earthenfire that he would be leaving town on an "unplugged" trip over the weekend and advised that he would catch up with him on Monday, March 25, 2024. @earthenfire reported that he would catch up with the UC on Monday, March 25, 2024.

On Monday, March 25, 2024, @earthenfire transitioned the conversation to Telegram "Secret Chat" and set a "self-destruct" timer to one hour.[3]  The UC advised @earthenfire, "Thursday @3. I'm down by Mass / 7th."  @earthenfire agreed to meet at that time and reported he could get there by 2 pm. The UC and @earthenfire also agreed to meet face to face and then head to the UC's apartment to meet the UC's purported son to sexually abuse. @earthenfire advised the UC that he would be able to bring "toys" and wanted to bring a gift for the UC's purported son. @earthenfire later sent a photograph of Spiderman-themed underwear for the UC's purported son and advised, "They had a multipack, hope he likes psiderman lol it was the only marvel they had, plus I thought you'd appreciate the slinging ropes pun…"

On Tuesday, March 26, 2024, @earthenfire forwarded approximately ninety (90) videos to the UC which all appeared to be CSAM files. The UC reviewed the content sent and observed that one of the videos depicted an adult male penetrating the mouth and anus of a toddler with his erect penis and a video of an adult male masturbating and ejaculating into the mouth of a prepubescent boy who is wearing a blindfold across his eyes.

At the request of the UC @earthenfire changed the "self-destruct" option to one week and advised that he would probably clear the content of the chat prior to the UC and him meeting. @earthenfire also reported that they should communicate on Scruff and "keep it pg like we're just

---

[3] The Telegram messaging application allows users to configure the messenger to delete messages from the chat log after a specific amount of time has passed. Telegram refers to this feature as a "self-destruct timer."

meeting to hang out." @earthenfire advised that his name is "Matt," consistent with the middle name of "Kaziah Matthew White."

On March 26, 2024, @earthenfire advised the UC that he was unable to meet at 3:00 p.m. due a conflict in his schedule. The UC reported that he would talk to his "ex" and try to get his purported son out of school early that day. The UC subsequently advised @earthenfire that he would be able to meet on March 28, 2024 at 10:00 am instead of 3:00 pm.

On March 27, 2024, the UC and @earthenfire continued to discuss meeting on Thursday, March 28, 2024, to include @earthenfire advising, "NGL kinda wondering if this is gonna be the start to a really awesome friendship w/ u & me like chill bros & become sorta like an uncle to him over time…" and "Thinking about it's got me so bricked rn buddy." @earthenfire forwarded a photograph of an adult male standing in front of a mirror clothed with a bulge in his groin being held by the male. The UC and @earthenfire agreed to meet at a coffee shop at a pre-arranged location in Northwest, Washington D.C.

On March 28, 2024, at approximately 7:25 am, @earthenfire advised via Telegram, "Woke up with pre everywhere. Me rn" and then forwarded a video of an adult male touching his exposed and erect penis. The UC later forwarded three photographs[4] of his purported son to @earthenfire to verify he had access to the child at that time. @earthenfire acknowledged the photographs and asked if the UC could send a video of his purported son waving to him and saying hi. The UC advised that he was uncomfortable doing that but asked if they could Facetime his purported son after they meet. @earthenfire agreed with this further verification.

During the conversation on Telegram the UC and @earthenfire were also using Scruff to communicate under the pretense that they were just meeting for coffee in case anything happened

---

[4] The photographs are not of a real child.

7

to them.  @earthenfire advised the UC on Scruff that he had left his home at approximately 0830 hours and was headed to meet the UC.  The Scruff application provides an approximate distance between users which indicated at that time the UC and @earthenfire were approximately twenty-two (22) miles apart, which is consistent with travel from Clarksville, MD, to the UC's location.  At approximately 9:18 a.m., @earthenfire reported that he was "20min out" and asked for parking recommendations.  The UC advised that he should try to park near the coffee shop and then he could get him a guest spot at his apartment garage.

At approximately 9:41 a.m., the UC observed an individual matching the description of Kaziah Matthew White wearing a green hat and black hoodie enter the agreed upon meeting location in Northwest, Washington D.C.  @earthenfire advised the UC that he was using the bathroom and reported that he was wearing a green hat and black hoodie.  The UC observed White walking to the rear of the coffee shop and then later saw him standing in the coffee shop looking around.

The UC approached White and greeted him by asking "Matt?" and stating his UC name. White recognized the UC and hugged him.  The UC and White left the coffee shop and walked into an adjoining office entrance to sit at a table.  The UC and White discussed White's drive down to D.C., his plans for the afternoon, and the Adirondacks. During that conversation, White indicated that he drove to D.C. from Clarksville, MD.  The UC asked White if he was ready to leave and that he could Facetime his purported son once they left so it would be more private. White agreed to leave and got up with the UC to leave the building.

The UC provided an arrest signal to members of the WFO FBI CEHTTF who were conducting surveillance around the meet.  The members then took White into custody without incident and transported him to WFO for processing and an interview.  White was found to be in

possession of spider man underwear at the time of his arrest and was debriefed by members of the FBI WFO CEHTTF.

On April 1, 2024, the defendant appeared before the court for an initial appearance and a detention hearing was scheduled for April 2, 2024.

## APPLICABLE LEGAL STANDARD

The defendant is charged with Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), and Travel with Intent to Engage in Illicit Sexual Conduct, in violation of 18 U.S.C. § 2423(b). Both charges are defined as crimes of violence: Distribution is defined as a crime of violence because it is a Chapter 110 offense and Travel is defined as a crime of violence because it is a Chapter 117 offense. *See* 18 U.S.C. § 3156(a)(4)(C). Further, both charges – § 2252(a)(2) and § 2423(b) – give rise to a rebuttable presumption of detention where Mr. White is charged with offenses involving minor victims pursuant to 18 U.S.C. § 3142(e)(3)(E), where it is to be *presumed* that no combination of conditions will protect the community or assure the defendant's return. § 3142(e)(3)(E). This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released"); *see also United States v. Hir,* 517 F.3d 1081, 1086 (9th Cir. 2008). Even if the defendant does not pose a flight risk, danger to the community by itself is a sufficient reason to order pretrial detention. *United States v. Salerno*, 481 U.S. 739, 755 (1987).

In determining whether the defendant has overcome that presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g). Even when the defendant has offered evidence to rebut the presumption of dangerousness, the presumption remains a factor in the court's analysis of the § 3142(g) factors. *See United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1983) ("Use of that word [rebutted] in this context is somewhat misleading because the rebutted presumption is not erased. Instead, it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."). As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010) ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").

## **ANALYSIS**

Defendant White poses a significant danger to children in our community, as well as in other locations, and there are no conditions short of detention that will protect children – both online and in the real world – from the defendant. For the reasons that follow, the United States submits that that the defendant cannot rebut the presumption that he shall remain detained, as there is no condition or combination of conditions that will reasonably assure the safety of any other person or children in the community.

A.      **Nature and Circumstances of the Charged Offense**

In the course of one week, defendant White distributed approximately 130 videos depicting the sexual abuse of children – intentionally trafficking in the misery perpetrated against the children depicted in these images for his own gratification – and then traveled across state lines for the specific purpose of engaging in the sexual abuse of a 10-year-old boy.  The nature and circumstances of his offense are of the utmost seriousness and weigh heavily in favor of detention.

As described above, the defendant came to the attention of law enforcement after he initiated contact with an undercover officer (UC) who used the online persona of someone interested in child sexual abuse material and child exploitation.  It was the defendant who, after seeing what the UC was purportedly interested in, specifically messaged the UC to "meet and play."  During the week-long chats, the defendant, who went to his "buddy" to get "content," allegedly distributed child pornography to the UC on three separate occasions.  In the early morning hours on March 22, 2024, the defendant sent approximately 20 videos depicting the sexual abuse of children.  Later on that same date, he sent another 20 videos depicting the sexual abuse of children.  Finally, on March 26, 2024, he sent approximately 90 additional videos depicting the sexual abuse of children.  All of this was in the context of building his relationship with someone who he had every reason to believe had access to a 10-year-old boy, was actively abusing that child, and was going to allow the defendant to also abuse that child.

Throughout the undercover operation, the defendant described the type of conduct that he was interested in engaging in with the UC's 10-year-old child, noting that, "Tbh pretty open, love full body play, kissing, jerking, sucking, looove to lick all over, porn, toys. I've got other goodies like rope and cuffs and stuff if we want to get spicier lol. Fuck so bricked thinking about it buddy." Not only was he interested in sexually abusing this child, but he was open to using "ropes and

11

cuffs" on a 10-year-old to make thigs "spicier." While "ropes and cuffs" may be innocuous in the context of a consenting adult sexual relationship, they are nothing short of horrifically violent when used in the context of abusing a child.

The defendant additionally made efforts to groom the purported child in advance, discussing bringing "toys," asking to speak with the child in advance, and even buying the child a gift. On March 25, 2024, the defendant sent the UC a photo of Spiderman-themed underwear intended as a gift for the child writing, "They had a multipack, hope he likes psiderman lol it was the only marvel they had, plus I thought you'd appreciate the slinging ropes pun…" Those same Spiderman underwear were recovered from the defendant on March 28, 2024, following his scheduled meeting with the UC. Throughout the entire duration of the chats, he demonstrated zero concern for a child who he had every reason to believe was being sexually abused and, instead, exhibited excitement and sexual arousal at the suggestion of a future sexual encounter with this child.

Finally, throughout his interaction with the OCE, White took steps to conceal his actions. Notably, he used features such as Telegram's "self-destruct" timer to attempt to conceal the fact that he had distributed child pornography. He also asked the UC to continue communicating on Scruff, and to "keep it pg like we're just meeting to hang out" so as to have plausible deniability for the actual purpose of their meeting: for defendant White to abuse a vulnerable child who was being offered up for the gratification of people who should have been there to protect him.

The defendant's alleged conduct here is horrendous, indicating that he poses a danger both to children in the real physical world as well as to unknown children who are suffering the aftermath of having images of their sexual abuse distributed online. On a broad level, children depicted in sexually explicit images and videos are victimized at the time the images were created,

and they are re-victimized each time an individual, like the defendant, views the images for their own sexual gratification. As explained by the Sixth Circuit in a child pornography case:

> ...we have numerous victims in a case like this, not one victim. Every image of a child, every image of a non-adult engaged in any type of sexual activity or any type of pose without clothing or any type of exploitation constitutes an additional case of victimizing a child. Without a demand for that type of information and that type of viewing from persons like this defendant, we don't know how many child abuse cases we could prevent. And as long as there is a demand to purchase images of child pornography, there is going to be an unending stream of child abuse of…children who are forced into these roles.
>
> ...every image has a child who has been exploited and abused, and that is the concern I have. It is the concern that I have when people are engaged in serially doing this, the effect it has on children throughout the world and the effect it has on their future lives.

*See United States v. Miller*, 665 F.3d 114, 121-122 (6th Cir. 2011)(quoting the district court) (rejecting an attack on the child pornography sentencing guidelines and highlighting the grave harm caused to the victims depicted in child pornography images and the evidence that traffickers and possessors of child pornography are the impetus for the creation of more sexual abuse of minors).

Indeed, Congress has recognized the serious nature of the offenses that this defendant is charged with, and the long-term damage that these crimes can cause, by specifying that these crimes carry a rebuttable presumption of detention. § 3142(e)(3)(E). The defendant is alleged to have distributed child pornography to someone he believed was actively sexually abusing a child and then traveled across state lines for the purpose of sexually abuse a 10-year-old boy. That the defendant's targeted child was fictitious does not alter the analysis: the defendant arrived in Washington D.C. fully expecting a sexual encounter with the child and, had the child been real, there would have been no check on his ability to sexually abuse that child. The defendant's actions demonstrate that he is a danger to children both online and in the real world and there is no

13

combination of conditions that will protect children both online and in the physical world from the defendant's predation and this first factor weighs heavily in favor of detention.

### B. The Weight of the Evidence Against the Defendant

The weight of the evidence against defendant White is very strong and also weighs in favor of detention. The United States is in possession of the week-long chat conversations on Scruff and Telegram between the UC and the defendant, to include the child pornography images and the images that the defendant sent of himself, including those sent in a heightened state of sexual arousal. The Scruff and Telegram accounts are tied to the defendant, most notably by the fact that it was White – and no one else – who arrived at the pre-arranged meeting location in Washington D.C. to meet with the UC on March 28, 2024. Identification is not plausibly in question in this case. Further, the content of the chats with the UC, and the fact that White arrived with Spiderman underwear in tow, forecloses the defense of mistake, accident, or lack of intent on the defendant's part.

Contrary to common argument in this District, the weight of the evidence should not be viewed as the "least important" of detention factors. Instead, a district court has broad discretion to determine the relative weight of each of the four Bail Reform Act factors, including the weight of the evidence against a defendant, when analyzing whether the defendant poses a danger or is a risk of flight. No factor is categorically of greater or lesser weight than the others. As the Second Circuit Court of Appeals has observed:

> Although § 3142(g) of the Bail Reform Act lists various factors to consider, it says nothing about the relative weight a court should give them when deciding whether to release or detain a defendant. *See generally* 18 U.S.C. § 3142(g). That silence is unsurprising, because the weight given to each factor will inevitably vary from case to case, and might even vary depending on whether the inquiry relates to a defendant's danger or to his risk of flight. What is more, certain factors might interact with one another in a particular case in a way that alters a court's analysis of a defendant's danger to the community or flight risk.

14

*United States v. Zhang*, 55 F.4th 141, 149-50 (2d Cir. 2022). In *Zhang*, the Second Circuit found that the district court gave appropriate weight to the second factor – the weight of the evidence – in determining that there was "significant evidence" that Zhang had in fact committed the charged murder. *Id.* at 150-51. Affirming the district court's relative reliance on the weight of the evidence in determining dangerousness, the court explained:

> In making a predictive assessment of the defendant's future dangerousness if released into the community, common sense and § 3142(g)(2) aligned with the district court's consideration of the strength of this evidence, especially coupled with the nature of the charged offense. It stands to reason that the more strongly the evidence indicated that the defendant committed the murder, the more likely he poses a danger to the community if released on bail.

*Id.* Similarly, in considering whether the defendant poses a risk of flight, the court explained that where "the evidence against a defendant is strong, it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight. *Id.* at 151-52.

The *Zhang* court's analysis holds true here, where the evidence against White is very strong, suggesting both a heightened danger to the community as well as an elevated risk of flight. The strength of the evidence strongly supports detention, as it indicates the significant risk of actual danger posed to children by the defendant, as well as an elevated risk of flight to avoid accountability on very serious charges.

    **C.**    **History and Characteristics of the Defendant**

Defendant White is before the court without any prior arrests or contacts with the criminal justice system. He is well educated, boasting a Masters degree from Syracuse University and, at the time of his arrest, the defendant is believed to have been employed and working Maryland for his job. The defendant also owns property in New York, where resides during portions of the year. While by all outward appearances the defendant has lived a law-abiding life, the week-long chat

15

conversation with the UC in March of 2024 paints a very different picture of the defendant and the danger that he poses to children online and in the physical world.

Indeed, the defendant's conduct in March of 2024 was not the first time that he has come to the attention of law enforcement for allegedly actively encouraging the sexual abuse of children. In fact, White is currently under investigation by local authorities in New York for strikingly similar conduct that took place over a year earlier, in January of 2023. The New York investigation was opened after law enforcement was alerted to a Discord chat conversation between a user identified as "Boots#4022," who is believed to be the defendant, and another individual, "Fratbro69perv#5797," a person later identified as Anthony Leatherman. *See* Gov't Ex. A. During that chat conversation, Leatherman distributed child pornography to "Boots#4022," while "Boots#4022" encouraged the sexual abuse of a child that Leatherman indicated that he had access to.[5] Leatherman, who resided in Indiana, was ultimately convicted and sentenced in relation to the sexual abuse of a child.[6] Law enforcement in New York began their investigation into White, the presumed user of "Boots#4022," in the follow-up to the investigation into Leatherman. The investigation remains open and apparently stalled because White was not residing at his residence in New York.

In light of the 2023 New York investigation, it is apparent that White's engagement with the UC in March of 2024 was not a one-time lapse in judgement. If the facts alleged as the basis for the New York are true, the defendant has been encouraging the abuse of and/or seeking out

---

[5] The United States will make the specific chats between "Boots#4022" and "Fratbro69perv#5797" available at the Court's request.

[6] The information regarding Anthony Leatherman has been orally provided to undersigned counsel by law enforcement partners and undersigned counsel is currently seeking written verification of the facts related to Leatherman.

16

children to sexually abuse for at least an entire year. White's history and characteristics counsel against release. He has demonstrated that he is a danger to children in both the physical world and online and the United States submits that his demonstrated sexual interest in children makes him an ongoing danger to any child he may encounter, wherever that may be.

### D. The Nature and Seriousness of the Danger to Any Person or the Community

Finally, the sexual exploitation and abuse of children presents a serious danger to the community, which results in severe mental, emotional, and physical trauma to the countless children who are victimized by offenders like the defendant and others with a demonstrated sexual interest in children. It is this type of harm that led Congress to create the statutory presumption of detention in these cases.

That child pornography offenses are serious is a fact noted by the Supreme Court. At least as early as the landmark decision, *New York v. Ferber*, 458 U.S. 747 (1982)*,* the Supreme Court referenced numerous research materials detailing the harm to children as a result of the production and trafficking of child pornography.

> [P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography."

Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act, 17 Wake Forest L.Rev. 535, 545 (1981). *See also* Child Exploitation 292 ("[I]t is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions"); Note, Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation, 12 U.Mich.J. Law Reform 295, 301(1979)(interview with child psychiatrist) ("The

victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child"). 458 U.S. 758, n.9.

Moreover, as the Eastern District of New York has found:

> ...the issue is not only defendant's potential abuse of children and his interaction with children if on bail, but also his ability, if he is released on bail, to attempt to possess additional child pornography, or to communicate and interact with (via email, internet, or phone) others involved in the possession, sale, and distribution of child pornography or other sexual abuse of children, which would also create a clear danger by facilitating the criminal and dangerous exploitation of children by other individuals.

*United States v. Reiner*, 468 F.Supp.2d 393, 397 (E.D.N.Y. 2006). The *Reiner* court further found that there were no conditions in that case that could reasonably assure the safety of the community "[i]n this day and age, with devices such as cellphones, Blackberries, and laptops..." Id. at 399; *see also United States v. Blankenship*, 2008 WL 1925137 (S.D.W.Va. April 29, 2008)(unpublished)(noting the ease of accessing the internet by means of various devices and stating "[t]he Court finds that the evidence clearly and convincingly establishes that, confined to his home and electronically monitored, defendant would not be prevented from obtaining the means to access the internet and attempting again to obtain child pornography and in this poses a danger to children and the community"); *United States v. Doyle,* 2007 WL 1097844, *1 (W.D.Va. 2007)(finding danger of future offenses "especially considering that pornographic images of children are widely available on the internet and can be easily accessed by a personal computer"), conviction rev'd on other grounds, 650 F.3d 460 (2011).

Given the risks that the defendant poses to children both in the physical world and online, there are no conditions or combination of conditions that will reasonably keep children in the community safe and assure his appearance if he is released. As such, this factor weighs heavily in favor of detention.

## CONCLUSION

For all of the reasons set forth above, a consideration of the evidence in this case and the applicable statutory factors compels the conclusion that the defendant should be detained pending trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar. No. 415082


_____/s/ Jocelyn Bond_____
Jocelyn Bond
D.C. Bar No. 1008904
Assistant United States Attorney
601 D Street, N.W.
Washington, D.C. 20530
Telephone: (202) 809-0793
Email: Jocelyn.Bond@usdoj.gov