## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case Number: 24-cr-340-DLF** |
| **KAZIAH WHITE,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, respectfully submits this Memorandum in Aid of Sentencing to assist the Court in sentencing the defendant, Kaziah White, who pled guilty on October 25, 2025, to one count of Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2). The United States recommends a sentence of 151 months of incarceration, at the bottom of the defendant's Sentencing Guideline's range, followed by a lifetime of supervised release.

### BACKGROUND

For a full week in March of 2024, the defendant, Kaziah White, enthusiastically encouraged the sexual abuse and exploitation of a 10-year-old boy by chatting online with someone who he believed was an abusive father offering up his own son for sex with others. White was so eager to sexually abuse this child that he distributed child pornography to build rapport with the father and offered specific recommendations on the ways in which he wanted to abuse the child. He even bought the child a "gift" of Spiderman underwear. White's efforts culminated on March 28, 2024, when he drove from Maryland to the District of Columbia – Spiderman underwear included – for the express purpose of sexually abusing the child. It is only because the "father" who White had been in contact

1

with was an undercover law enforcement officer that a child was not abused that day.  White's actions make clear that he intended otherwise.

White came to the attention of law enforcement on March 21, 2024, when he initiated contact with an online undercover officer (UC) who was working as part of the FBI Child Exploitation and Human Trafficking Task Force (CEHTTF), operating out of a satellite office in Washington, D.C. Using the dating application Scruff, the UC maintained a profile page indicating that he had a sexual interest in children by prominently displaying certain hashtags and keywords on his profile page. White contacted the UC via Scruff saying, "Fuck yes prv bro…👬🍕[1]…Would love to meet n play." White, who was using the username "EarthenFire✈️MD," indicated that he was staying in Clarksville, Maryland, at the time but that he could "travel basically anywhere during the day."

The conversation then transitioned to Telegram direct message, where White and the UC discussed the sexual exploitation of children generally, as well as the sexual exploitation of the UC's purported ten-year-old son.  White utilized the username @earthenfire on Telegram, where he explained "Broooo I'm only the area til the end of the month, would love to plan a playdate.  We can get lunch somewhere public first if u wanna feel out the vibe.  And show u Im not a cop lmfao.  Have an after school bonding sesh."  @earthenfire indicated that "5-14" were his favorite ages and that he "Always wanted to find a dad who bonds with his boy."  The UC asked if he was open to younger ages and @earthenfire advised, "Oh I'm totally open, but just my fave age range."  @earthenfire additionally stated, "Also got my own place in Northern NY, would be hot to host y'all for a father son camping trip haha….Def total boy prv here raised right.  Love spreading that deep man boy bonding."

---

[1] The pizza emoji, or "cheese pizza" is frequently used in the child exploitation world as a keyword for child pornography.

During the weeklong communication, the UC and @earthenfire discussed activities they could engage in with the UC's purported son and the UC qualified that there were rules. Specifically, "No blood, no bruises, and no crying" and @earthenfire advised, "Hell yeah I don't get into violence of pain, verrrry passionate and playful and loving here." The UC also reported, "Haven't gotten to fuck him yet, only rub my cock all over his hole..." and @earthenfire advised, "Nah he needs training haha. My step dad and I did toys for months before he finally got to breed me."

The UC and @earthenfire discussed meeting on Thursday, March 28, 2024. The UC asked what @earthenfire would be interested in doing and he advised, "Tbh pretty open, love full body play, kissing, jerking, sucking, looove to lick all over, porn, toys. I've got other goodies like rope and cuffs and stuff if we want to get spicier lol. Fuck so bricked thinking about it buddy."

On March 22, 2024, the defendant messaged the UC, "Also had a buddy send some content if u wanna see 😈😈😛." He then forwarded twenty (20) videos of child sexual abuse material (CSAM) to the UC. The videos include,

1. A twenty-three (23) second long video of a completely nude prepubescent male being anally penetrated by an adult male's erect penis. The adult male appears to be recording the abuse and the video is watermarked with, "Dark Fantasy."

2. A forty-six (46) second long video of an adult male penetrating the anus of a prepubescent boy with his mouth while the boy is laying on a couch.

3. A twenty-four (24) second long video of a completely nude prepubescent male being anally penetrated by an adult male's erect penis.

The UC and the defendant continued to discuss the sexual exploitation of the UC's purported son and confirmed again to meet on Thursday to engage in sex acts with the purported child. The UC advised the defendant that he would begin to prepare the purported child for his visit on Monday and advised that he could "share whatever you want with him" during that process. @earthenfire advised, "yuuuupp all about the bonding and building up excitement….Hell yeessss."

On March 22, 2024, the defendant wrote, "Preview of your view of me with him in a week 😈😊" and forwarded over twenty (20) additional videos of CSAM to the UC to include a video of an adult male nude from the waist penetrating the mouth of a prepubescent boy with his erect penis while holding the back of the child's head down.

On March 25, 2024, White transitioned the conversation to Telegram "Secret Chat" and set a "self-destruct" timer to one hour.[2]  He later changed this feature, at the request of the UC, to self-destruct in one week.  During their chat on that date, the UC and the defendant agreed to meet in person on Thursday, March 28, 2024, for the defendant to sexually abuse the UC's purported son. The defendant advised the UC that he would be able to bring "toys" and wanted to bring a gift for the UC's purported son.  @earthenfire later sent a photograph of Spiderman themed underwear for the UC's purported son and advised, "They had a multipack, hope he likes psiderman lol it was the only marvel they had, plus I thought you'd appreciate the slinging ropes pun…"

On March 26, 2024, @earthenfire forwarded approximately ninety (90) videos to the UC which all appeared to CSAM files.  The UC reviewed the content sent and observed that one of the videos depicted an adult male penetrating the mouth and anus of a toddler with his erect penis and a video of an adult male masturbating and ejaculating into the mouth of a prepubescent boy who is wearing a blindfold across his eyes.

On March 27, 2024, the UC and @earthenfire continued to discuss meeting on Thursday, March 28, 2024, to include @earthenfire advising, "NGL kinda wondering if this is gonna be the start to a really awesome friendship w/ u & me like chill bros & become sorta like an uncle to him over time…" and "Thinking about it's got me so bricked rn buddy."  @earthenfire forwarded a

---

[2] The Telegram messaging application allows users to configure the messenger to delete messages from the chat log after a specific amount of time has passed.  Telegram refers to this feature as a "self-destruct timer."

photograph of an adult male standing in front of a mirror clothed with a bulge in his groin being held by the male. The UC and @earthenfire agreed to meet at a coffee shop in Northwest D.C.

On March 28, 2024, White drove from Clarksville, Maryland, to Washington D.C. to a designated coffee shop to meet with the UC. He was arrested upon his arrival and, at the time of his arrest, was in possession of the Spiderman underwear consistent with the photo that he sent to the UC on March 25, 2024.

White pled guilty on October 25, 2024, to one count of Distribution of Child Pornography, in violation of 18 U.S.C. 2252(a)(2). Sentencing is scheduled for May 7, 2025, and the United States seeks a sentence of 151 months, at the bottom of the defendant's Sentencing Guideline's range. Such a sentence is reasonable in the circumstances and no greater than necessary to effectuate the purpose of sentence.

## DISCUSSION AND RECOMMENDATION

### I.    Generally Applicable Legal Principles

In determining an appropriate sentence, a district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range. *See United States v. Gall*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). Then, after giving both parties an opportunity to argue for an appropriate sentence, the district court should consider each of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the

Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

In addition to the § 3553 factors, in child pornography cases the court should also consider the reports prepared by the U.S. Sentencing Commission specifically addressing sentencing in such cases. In 2012 and 2021, the U.S. Sentencing Commission published reports to Congress analyzing federal sentences in both production and non-production child pornography offenses. The reports recommend three categories of aggravating factors that courts should consider when imposing sentences in non-production cases: content, community, and conduct. The Commission further explained how these factors should affect a defendant's sentence:

> The presence of aggravating factors from any of these three categories, even without the presence of any aggravating factors from the other two categories, warrants enhanced punishment depending on the degree that aggravating factors from that category are present in a particular case. The presence of aggravating factors from multiple categories generally would warrant a more severe penalty than the presence of aggravating factors from a single category.

U.S. Sent'g Comm'n, Report to Congress: Federal Child Pornography Offenses (2012) at 321 (hereinafter 2012 Report).

*Content*

As outlined in the 2012 Report, this factor directs courts to evaluate the content of an offender's collection and behavior "in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology." 2012 Report at 320.

*Community*

This factor directs the Court to evaluate "the degree of an offender's engagement with other

6

offenders — in particular, in an Internet 'community' devoted to child pornography and child sexual exploitation." 2012 Report at 320. The Commission distinguishes between impersonal file-sharing exchanges, which involve "anonymous, indiscriminate" open exchange and no two-way communication, versus "personal" distribution in closed groups, involving two-way communication concerning child pornography and child exploitation. *Id.* at 313-14, 324.

*Conduct*

The third factor asks courts to assess whether an offender "has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense." 2012 Report at 320. Notably, the Commission recommends that, in addition to criminal offenses, courts consider "non-criminal acts of sexually deviant behavior" because such behavior also indicates sexual dangerousness. *Id.* at. 325.

## II.    Government's Sentencing Recommendation

Here, the United States recommends a sentence of 151 months of incarceration, the bottom of the defendant's sentencing guidelines range, to be followed by a lifetime of supervised release. This takes into account the seriousness of the defendant's conduct, acknowledges the danger that he poses to the community, and ensures that he will be monitored for a significant period of time upon his release, thus protecting the community from harm.

### A.    Nature and Circumstances of the Offense

For a full week in March of 2024, White actively sought out a 10-year-old boy to sexually abuse. This was not just fantasy for him. White repeatedly engaged and reengaged a person whom he had every reason to believe was a father offering him a child to sexually exploit. White then distributed child pornography to continue building a relationship with that father, simultaneously demonstrating his sexual interest in children and his seriousness about abusing the 10-year-old. And White did not stop there. He distributed well over 100 videos containing CSAM, including horrific

7

videos depicting the sexual abuse of toddlers, as well as sadomasochistic abuse involving a blindfolded child.  He expressed his willingness to not only abuse a 10-year-old, but also his willingness to amplify the damage to that child by introducing "other goodies like ropes and cuffs" into the abuse.  While such "goodies" may play a role in adult sexuality, introducing "ropes and cuffs" in the context of raping a child is nothing short of sadistic.  White then left no room for doubt about his intentions when he arrived in Washington D.C. in possession of the Spiderman underwear that he bought the child as a "gift."

White pled guilty to the single charge of distribution of child pornography.  Nevertheless, his distribution must be understood in the context of his ultimate goal:  the distribution of child pornography was a means to an end for him.  He distributed child pornography to build and solidify the developing relationship with the UC, someone who he thought had a shared sexual interest in children and would allow him the opportunity for sex with a child.  White's distribution was in service to that goal.

Considering the factors outline by the 2012 and 2021 Sentencing Commission reports, both the content of the material that White distributed and the personal one-on-one community that he fostered with the UC are relevant to the Court's sentencing determination.  White distributed a substantial volume of material, including images depicting extremely young victims as well as victims who were subjected to sadomasochistic abuse.

The distribution of child pornography is a crime that not only further encourages and normalizes the abuse of children, but that also continues the harm to the actual child victims of sexual abuse.  Children depicted in images and videos depicting their sexual abuse are traumatized and victimized in the worst way imaginable at the time the images were created, and they are re-victimized each time an individual, like the defendant, views the images for their own sexual gratification. As explained by the Sixth Circuit in a child pornography case:

...we have numerous victims in a case like this, not one victim. Every image of a child, every image of a non-adult engaged in any type of sexual activity or any type of pose without clothing or any type of exploitation constitutes an additional case of victimizing a child. Without a demand for that type of information and that type of viewing from persons like this defendant, we don't know how many child abuse cases we could prevent. And as long as there is a demand to purchase images of child pornography, there is going to be an unending stream of child abuse of…children who are forced into these roles.

...every image has a child who has been exploited and abused, and that is the concern I have. It is the concern that I have when people are engaged in serially doing this, the effect it has on children throughout the world and the effect it has on their future lives.

*See United States v. Miller*, 665 F.3d 114, 121-122 (6th Cir. 2011)(quoting the district court) (rejecting an attack on the child pornography sentencing guidelines and highlighting the grave harm caused to the victims depicted in child pornography images and the evidence that traffickers and possessors of child pornography are the impetus for the creation of more sexual abuse of minors). White's distribution of child pornography warrants a sentence within the Sentencing Guidelines. He distributed a substantial volume of material and the content of the material includes both extremely young victims as well as the sadistic abuse of children. Even more disturbing, White distributed this material as a means to an end: his purpose was to gain access to a child, and he distributed child pornography to further the relationship with a "father" who he believed to give him that access.

**B.     History and Characteristics of the Defendant**

<u>White's Conduct was Not a One-Time Lapse in Judgement</u>

Significantly, White's interaction with the UC in this case was not the first time that he came to the attention of law enforcement for sexually themed chats involving children. White's lack of criminal convictions is not evidence that weighs in favor of a lighter sentence. It only demonstrates his ability to conceal his criminal conduct from law enforcement. White previously came to the attention of law enforcement in January of 2023 in connection to a person named Anthony Leatherman, who was convicted of the sexual abuse of a child. In that 2023 investigation, law

enforcement in New York opened an investigation after being alerted to a Discord chat conversation between a user identified as "Boots#4022," tentatively identified as Kaziah White, and another individual, "Fratbro69perv#5797," the individual later identified as Anthony Leatherman.  In that Discord chat conversation, Leatherman distributed child pornography to "Boots#4022," while "Boots#4022" encouraged the sexual abuse of a child that Leatherman indicated that he had access to.  Leatherman, who resided in Indiana, was ultimately convicted and sentenced in relation to the sexual abuse of a child.  Law enforcement in New York began their investigation into White, the presumed user of "Boots#4022," in the follow-up to the investigation into Leatherman and were able to link the Discord user Boots#4022 through a phone number in the subscriber name of "Kaziah M White," with an address in New York.  However, the New York investigation into White was closed on September 5, 2024, following White's arrest in this case.

White's alleged participation in explicit chats with Leatherman in January of 2023 – more than a year before he encountered the UC in this case – undermine his claims that he cannot remember engaging in the conduct here because of "blackouts."  *See* Psychosexual Evaluation and Risk Assessment, Travis Flower, February 26, 2025, at 7 (hereinafter "Flower Evaluation").  According to Dr. Travis Flower, White claims that, with respect to the offense conduct, "he does not remember downloading the Telegram mobile application, communicating with the undercover officer, or sending a majority of the videos he sent..." *Id.* at 7.  While this may offer White a convenient excuse to distance himself from his own conduct, it is not supported by any corroboration.  Notably, Flower explained hat White's claims should be viewed with caution, writing:

> The examiner views Mr. White's reports of amnestic blackouts and other potential dissociative experiences with particular caution, given Mr. White['s] response style on the psychological testing, the reported onset and course of the symptoms, the lack of available corroboration, the timing of Mr. White's report of the symptoms, and the exculpatory importance Mr. White might perceive the symptoms to have.

*Flower Evaluation* at 12. The Court should approach White's claims of amnestic blackouts with the same caution advocate by Flower. White does not have any diagnosis which would suggest that he does, in fact, experience amnestic blackouts, nor is there any other corroboration for his claims. Thus, the Court should give little weight to White's claims on this point and should not rely on this apparently self-serving excuse as a basis for a more lenient sentence.

> White Presents an Average Risk of Recidivism

White presents an "Average" risk of recidivism and the Court's sentence should reflect the danger that he poses upon release. As part of his evaluation, Flower used the Static 99-R and Stable 2007 risk assessment tools and, after integrating the results from those two tools, Flower explained,

> Because his Stable-2007 score falls in the moderate-risk range, his overall rating is maintained in the Average Risk group with the two instruments are integrated. Research on the offenders rated on both the Static-99R and Stable-2007 estimates that, within five years of release to the community, approximately 7.5% of Level III offenders would be expected to sexually reoffend.

*Flower Evaluation* at 10. Even in the "average" risk group, a strikingly high 7.5% of offenders are estimated to sexually reoffended within five years of release. This high percentage underscores the necessity of removing such offenders from the community for a lengthy period of time and the importance of providing supervision when such offenders are released.

> White's History of Abuse is Not a Mitigating Factor

Finally, the Court should not view the defendant's report of prior abuse as a child as a mitigating factor. While the research is complex, there is no causal relationship between having been abused as a child and later abusing others as an adult. *See, e.g.*, Cathy Widom et al., Intergenerational Transmission of Child Abuse and Neglect: Real or Detection Bias?, 347 Science 1480 (2015), available at https://science.sciencemag.org/content/347/6229/1480.long (discussing conflicting empirical studies, including some that found "no evidence" of "intergenerational transmission of

11

child abuse"); Chelsea Leach et al., Testing the Sexually Abused–Sexual Abuser Hypothesis: A Prospective Longitudinal Birth Cohort Study, 51 Child Abuse & Neglect 144 (2016), abstract available at https://www.sciencedirect.com/science/article/abs/pii/ S0145213415003828 (finding "no specific association between sexual abuse and sexual offending" and concluding that "very few" sexually abused boys in a studied cohort "went on to become sexual offenders"); Cathy Widom, A Prospective Examination of Whether Childhood Sexual Abuse Predicts Subsequent Sexual Offending, Jama Pediatrics (American Medical Association) (January 5, 2015)("The widespread belief that sexually abused children are uniquely at risk to become sex offenders was not supported by prospective empirical evidence").

A number of studies conducted on the "cycle of abuse" theory have found that individuals who are victims of sexual abuse as a child develop empathy for others and do not commit acts of abuse when they become adults. Notably, in a study published in 2016, researchers conducted qualitative research on male victims of sexual abuse, inquiring why they had not perpetuated the abuse on others. "By far, the most commonly cited reason the participants gave for having not sexually offended was experiencing empathy for other people and having no desire to hurt others."[3] When asked to explain, participants in the study made statements such as, "Experiencing pain is like putting your hand in the fire. You don't have to tell anyone twice that they are experiencing pain. I wouldn't want to stick someone else's hand in the fire. . . I'm aware of the pain and emotions that an abused person would go through and I don't want to put anyone else through that."[4] The study's authors observed that "[s]uch evidence is unique as it directly contradicts the victim–offender cycle hypothesis because it demonstrates that not all victims become offenders and, in fact, the victimizing

---

[3] Osman SL. (2011). Predicting rape empathy based on victim, perpetrator, and participant gender, and history of sexual aggression. Sex Roles 64, 506–515.
[4] Id.

experience contributed to their status as a nonoffender."[5]  In other words, instead of making them *more* likely to offend against a child, being a victim of sexual abuse actually makes them *less* likely to offend because the natural empathy developed from such experiences deters such perpetuating behavior. Moreover, the same report observed, numerous studies have shown that "the majority of victims do not become sexual offenders,"[6] which "adds substantially to the argument that the pathway from victim to offender is not as direct as the literature would have us believe."[7]

Other researchers have similarly concluded that although "[t]he victim-offender cycle in male sexual abuse has been popularized as an explanation of why some males sexually offend," "there are serious limitations to this explanation."[8]  As one journal article explained it, "sexual abuse at particular ages and frequency of abuse do not of themselves necessarily lead to an increased likelihood of perpetuating abuse across generations."[9] Indeed, "the data do not provide strong support for a cycle of sexual abuse encompassing a substantial proportion of male perpetrators" and "prior victimization may have some effect in a minority of perpetrators."[10]

While it is natural to empathize with someone who has experienced childhood abuse, White's history of having experienced abuse as a child has no causal relationship to his choice as an adult to distribute child pornography, or to seek out sex with a child.  Thus, the defendant's childhood history is not a mitigating factor here and does not support a downward variance from the Sentencing

---

[5] *Id*.

[6] *Id*. (citing Jespersen et al., 2009; Thomas & Fremouw, 2009; Widom & Ames, 1994; Salter et al., 2003).

[7] *Id*.

[8] Lambie, Ian, et al*., Resiliency in the victim-offender cycle in male sexual abuse*, Sex Abuse: A Journal of Research and Treatment 14(1), 43 (2002).

[9] Briggs, F. and R. Hawkins, *A Comparison of the Childhood Experiences of Convicted Male Child Molesters and Men who were Sexually Abused in Childhood and Claimed to be Nonoffenders*, Child Abuse & Neglect 20(3), 230 (1996).

[10] Glasser, M. et al., *Cycle of child sexual abuse: links between being a victim and becoming a perpetrator*, The British Journal of Psychiatry 179, 488 (2001).

Guidelines. Instead, the United States asks for a sentence at the bottom of the defendant's Guidelines of 151 months of incarceration, followed by a lifetime of supervised release.

**C.    Seriousness of the Offense, Promotion of Respect for the Law, and Just Punishment for the Offense**

Child pornography offenses are extremely serious because they result in perpetual harm to the most vulnerable victims, while simultaneously validating and normalizing the sexual exploitation of children. Courts across the country have recognized this:

> There can be no keener revelation of a society's soul than the way in which it treats its children. Given the current statistics surrounding child pornography, we are living in a country that is losing its soul.

> Child pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease. However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of the defendants, sorry that their actions were discovered by law enforcement.

*United States v. Cunningham*, 680 F.Supp.2d 844, 847 (N.D. Ohio, 2010), *affirmed* 669 F.3d 723 (6th Cir. 2012).[11]

When enacting mandatory minimum penalties for those who produce and traffic in the sexual abuse and exploitation of children, Congress similarly described the evil of child pornography:

> [W]here children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years . . . [The] existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children . . . it inflames the desires of . . . pedophiles . . . who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of

---

[11] *See also In re Amy Unknown*, 636 F.3d 190, 201 n.12 (5th Cir. 2011) (*citing United States v. Norris*, 159 F.3d 926 (5th Cir. 1998) (describing how the distribution of child pornography creates a marketplace for images of children, perpetuating abuse); *United States v. Yuknavich*, 419 F.3d 1302, 1310 (11th Cir. 2005); *United States v. Grosenheider*, 200 F.3d 321, 332-34 (5th Cir. 2000).

actual children who are victimized as a result of the existence and use of these materials.

Child Pornography Prevention Act of 1996, Pub.L. No. 104-208, § 121, 110 Stat. 3009, 3009-27 (1996).

There is perhaps no greater invasion of privacy than that caused by the dissemination of child pornography. With a click of the button on a camera, the sexual abuse of these children is memorialized forever. It is terrible enough that a child must live with the memory of his or her initial abuse. It is hard to even comprehend how that child could then learn to cope with the fact that strangers everywhere are using the worst moments of that child's life to sexually gratify themselves and that he or she can do nothing to stop them from continuing to do so. The only recourse that these children have is the strong enforcement of the laws that hold these offenders accountable for the tremendous damage they have inflicted upon countless child victims.

Distributors of child pornography, like the defendant, create a market and demand for materials depicting the sexual abuse and exploitation of real children. They contribute to the cycle of abuse and are in part responsible for the harm suffered by the children used to produce the materials in their collections. *See United States v. Goff,* 501 F.3d 250, 259-260 (3d Cir. 2007) ("Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography"). In *United States v. Goldberg,* the Seventh Circuit stated:

> The district judge was influenced by the erroneous belief that a sentence affects only the life of the criminal and not the lives of his victims. Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded-both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. [Citations omitted].

491 F.3d 668, 672 (7th Cir. 2007). In other words, even if consumers of child pornography do not themselves molest children, their actions directly contribute to the abuse of children.

Here, the defendant made the conscious decision to distribute child pornography in the hope of gaining access to a child. A significant period of incarceration is necessary to promote respect for the law, ensure just punishment, and to reflect the seriousness of the defendant's offense.

### D.     Adequate Deterrence and Protection of the Public

The receipt of child pornography endangers the public by encouraging the rape, violence, and abuse of children. In *United States v. Miller*, the Fifth Circuit stated:

> [R]eal children are being abused and violated when pornographic images are made. Without a market for such images, and without a strong appetite for more and more images exhibited by [defendant] and similarly situated defendants, there would be far fewer children who are injured and criminally assaulted in this way. If a handful of pornographic images taken twenty years ago were sufficient to satisfy the perverse desires of those who possess and traffic in child pornography, we would not have the huge industry that exists internationally today.

665 F.3d 114, 123 (5th Cir. 2011). The importance of deterrence with respect to child pornography offenses is well-established. Serious penalties for child pornography offenders decrease the number of participants in the market, which in turn decreases the need for its production:

> The greater the customer demand for child pornography, the more that will be produced. Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

*Goldberg*, 491 F.3d at 672; *see also Osbourne v. Ohio*, 495 U.S. 102, 109-10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand"); *Goff*, 501 F.3d at 261 ("Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing."); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) ("Transporting and receiving child pornography increases market demand. The greater concern under the Guidelines is for the welfare of these

exploited children. The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.").

Here, White's sentence should be sufficient to deter not only him from reoffending in the future, but also to deter the criminal conduct of others who engage in, or contemplate engaging in, the trafficking of child sexual abuse material. As stated in *Goldberg*, "[s]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for trafficking in child pornography, the greater the customer demand for it and so the more will be produced." 491 F.3d at 672. *See also Goff*, 501 F.3d at 261 (stating in a child pornography possession case that "deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing"). The government's recommended sentence of 151 months' incarceration, which is at the bottom of the guidelines, adequately serves this purpose.

    **E.**    **Kinds of Sentences Available and the Need to Avoid Unwarranted Sentencing Disparities**

Section 3553(a)(6) requires courts to consider the need to avoid unwarranted sentencing disparities among defendants "with similar records who have been found guilty of similar conduct." However, it "does not require the district court to avoid sentencing disparities between [ ] defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010). Here, the government's recommended sentence is within the Sentencing Guidelines range; per the plea agreement, both parties have agreed that this range is reasonable.  The low-end sentence recommended by the United States takes into account not only the stand-alone distribution of child

pornography, but also the defendant's week-long communication with the UC as well as his travel to the District of Columbia to engage in sex with a child.

**F.      The United States is Not Seeking Restitution at This Time**

In child pornography cases, restitution is mandatory to any person "harmed as a result of" a defendant's crime. *See* 18 U.S.C. § 2259(a), (c); *see also United States v. Monzel*, 930 F.3d 470, 476 (D.C. Cir. 2019); *United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015) ("Pursuant to 18 U.S.C. § 2259, the victims of certain federal crimes, including possession of child pornography, are entitled to mandatory restitution."). Restitution includes "the full amount of the victim's losses," which may include any costs incurred by the victim for:

(A) Medical services relating to physical, psychiatric, or psychological care;
(B) Physical and occupational therapy or rehabilitation;
(C) Necessary transportation, temporary housing, and child care expenses;
(D) Lost income;
(E) Attorneys' fees, as well as other costs incurred; and
(F) Any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(a), (b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015).

At this time the United States is not submitting any restitution requests on behalf of any known victim because no victims have made such a request. If the United States later identifies any victims who are seeking restitution the government may submit a restitution request in the future. *See* 18 U.S.C. § 3664(d)(5).

**CONCLUSION**

For the reasons addressed above, the United States respectfully recommends that the defendant be sentenced to a term of incarceration of 151 months, followed by a lifetime of supervised release. Such a sentence contemplates not only the relevant guidelines range set forth for this offense, but also adequately reflects the factors as outlined in 18 U.S.C. Section 3553(a).

Respectfully submitted,

EDWARD MARTIN
UNITED STATES ATTORNEY
D.C. Bar No. 481866

By:        */s/ Jocelyn Bond*
Jocelyn Bond
DC Bar #1008904
Assistant United States Attorney
United States Attorney's Office
601 D Street, NW
Washington, DC 20530
Phone: (202) 809-0793