## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 24-CR-340 (DLF)** |
| | ) | |
| **KAZIAH WHITE** | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Kaziah White, by his attorney, hereby submits the following memorandum in aid of sentencing in this matter.

Mr. White has survived both ██████████████████████ and a tragic vehicle accident as an adult. ████████████████████████████ ████████████████████████████████████████████████ ████████████████ At the same time, his mother inflicted emotional abuse, refusing to call Mr. White by his given first name and trying to turn him against his father. As an adult, Mr. White looks back on his childhood with shame, but has struggled with how to tell his family what happened and address the continued effects of the abuse.

Mr. White studied hard in school and found a passion for music, playing, composing, and conducting. After getting his master's degree in music, Mr. White was researching graduate university options to pursue a degree in conducting. Unfortunately, in August 2018, Mr. White was in a traumatic motor vehicle collision. His vehicle was struck by a logging truck that drifted over the center line and he suffered serious injuries, including 23 broken bones. He underwent a partial

amputation of his left arm, which included removing the deltoid muscle. He was hospitalized for months before transitioning to rehabilitation, which lasted an additional number of months. Today, Mr. White has limited mobility in his left arm. His dreams of working as a conductor were crushed by that accident.

Since the accident, Mr. White isolated himself, living in rural New York and working on a remote campground. It was after this accident and during this time of isolation that Mr. White began to think about his past and think about the abuse he suffered.

Mr. White's time in the D.C. Jail has provided him with perspective. From the very first instance that counsel met Mr. White, he was adamant about wanting to accept responsibility, assist law enforcement in any way possible, and finally seek treatment to allow him to fully come to terms with his own abuse and the abuse he recognizes his conduct has caused others.

Given the § 3553(a) factors present, Kaziah White respectfully requests that the Court consider a sentence of 60 months' incarceration, which is the mandatory minimum required sentence. Given the significant required sentence, Mr. White's history and characteristics, and the stringent registration and supervision requirements he will be subject to, including sex offender treatment, Mr. White submits that no more time of incarceration is necessary to accomplish the goals of sentencing.

## I.    Procedural Background

Mr. White entered a guilty plea to one count of Distribution of Child Pornography in violation of 18 U.S.C. § 2252(a)(2). Mr. White will be before the Court for sentencing on May 7, 2025.

## II.    Legal Standard

The appropriate punishment in every case must be designed to "fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). The Sentencing Guidelines remain in tension with this principle, and do a particularly poor job of incorporating a person's history and characteristics in the determination of an appropriate sentence. Indeed, on this point they contradict the law. *See* U.S.S.G. § 5H1.1 *et seq.* (contending that education, vocational skills, employment record, family ties, age, health, and socio-economic status are generally irrelevant to sentencing even though § 3553(a)(1) expressly requires sentencing courts to consider such factors).

It is now "emphatically clear" that the "Guidelines are guidelines—that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). The Court must keep in mind that, as the Department of Justice has also noted, determining the Guidelines range is no substitute for an independent determination

of a sentence that is "appropriate [and] serve[s] the interests of justice." *See* Gov't Supp. & Amend. Sent. Mem., *United States v. Stone*, No. 19-cr-18 (ABJ) (D.D.C. Feb. 11, 2020) (requesting a sentence "far less" than the "technically applicable" Guideline range, which can result in advisory sentencing ranges that are "unduly high," "excessive and unwarranted under the circumstances," and insufficiently reflective of the other U.S.S.G. § 3553(a) factors); *see also Nelson v. United States*, 555 U.S. 350 (2009); *Spears v. United States*, 555 U.S. 261 (2009); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

As the Supreme Court explained in *Nelson*, "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." 555 U.S. at 352. "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Id.* Thus, after evaluating the Guidelines along with the other co-equal sentencing factors set forth in 18 U.S.C. § 3553(a),[1] a sentencing court may find that the case falls outside the "heartland" contemplated by the Guidelines, or that "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007); *United*

---

[1] These other factors are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the kinds of sentences available, (3) the need to avoid unwarranted sentencing disparities, (4) the need for restitution, and (5) the need for the sentence to reflect: the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a).

*States v. Booker*, 543 U.S. 220, 259-60 (2005). Ultimately, the central mandate of § 3553(a) requires district courts to impose a sentence sufficient but not greater than necessary to comply with the purposes of sentencing set forth in § 3553(a)(2).

**III.    The Sentencing Guideline Enhancements set forth in U.S.S.G. § 2G2.2 Result in a Guidelines Range that is Incompatible with the § 3553(a) Factors.**

The defense submits that in the present case the Sentencing Guidelines should be rejected on policy grounds. A sentencing judge "may vary from Guideline ranges based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101. Such a policy disagreement is appropriate because several of the enhancements that apply have been widely criticized on policy grounds. Many circuit courts have expressed concern over the high guideline range that child pornography cases produce. *See, e.g., United States v. Grober*, 624 F.3d 592, 597 (3d. Cir. 2010) (discussing articles that show the flawed nature of the child pornography guidelines).[2] District and Circuit Courts have expressed concern over the child

---

[2] *See* Stabenow, Troy, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines*, available at https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/senten cing_resources/deconstructing_the_guidelines/child-porn-july-revision.pdf (January 1, 2009). In this article, the progression of the guidelines are dissected and show that the base offense level for child pornography offenses evolved from a based offense of 13 to 17 in 1996 and then to 18 (for possession only) in order to account for various circumstances typically associated with modern day child pornography offenses. Unfortunately, the additional enhancements that were also added over the years contradict this intention to modify the base offense level to reflect the seriousness of the offense. Now, we are in a situation where the base offense level is supposed to account for the egregiousness of most offenses but is oddly doubled in severity for defendants because of the extra enhancements resulting in adjusted offenses levels of 26 and beyond for most cases.

pornography guidelines and found that they were not based on empirical data. *See, e.g., United States v. Dorvee*, 616 F.3d 174 (2d. Cir. 2010); *United States v. Baird*, 580 F. Supp. 2d 889 (D. Neb. 2008); *United States v. Shipley*, 560 F. Supp. 2d 739 (S.D. Iowa 2008). In *Grober,* the district court found the guidelines to be so flawed because most of the enhancements are essentially inherent in the crime and applied in almost every case. *Grober*, 624 F.3d at 597.[3]

The United States Sentencing Commission—in a Report that "updates and expands upon the United States Sentencing Commission's 2012 Child Pornography Report to the Congress"—essentially agreed with those courts that acknowledge that the Guidelines are significantly flawed when it comes to child pornography offenses. USSC, Federal Sentencing of Child Pornography Non-Production Offenses, available at    https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf    (June    2021).    The    Report concludes: "Due to advancements in technology, enhancements that were only intended to apply to the most serious child pornography offenses were routinely applied to most non-production child pornography offenders." *Id*. at 2.

The Report goes on to specifically find the following:

- The guideline fails to distinguish adequately between more and less severe cases. Most specific offense characteristics apply in every case—in FY 2019, over 95% of cases were enhanced for the use of a computer and for images

---

[3] The Second Circuit also agreed with this analysis in *United States v. Tutty*, 612 F.3d 128 (2d Cir. 2010) and *United States v. Volpe*, 224 F.3d 72 (2d Cir. 2000). These cases explain in detail why certain enhancements would apply in virtually every case. For example, the computer enhancement allows "double-counting" because it effectively increases a defendant's sentence to reflect the kind of harm that has already been accounted for by the modern day offense levels.

depicting victims under age 12; 84% of cases received the sadistic/masochistic or abuse of an infant/toddler enhancement; and 77.2% of cases were enhanced for involving 600 or more images. *Id*. at 4

- While the sentences imposed are severe (in FY 2019, 99% of all individuals were sentenced to imprisonment and the average sentence was 103 months), courts regularly reject the § 2G2.2 guidelines as too high. Only 30% of individuals sentenced under § 2G2.2 in FY 2019 were sentenced within the guideline range and almost 59% of sentences were below the range. *Id*. at 5.

- The overall recidivism rate for non-production defendants is low (27.6%) and the rate of sexual recidivism is very low (4.3%). The most common new offense type was administration of justice, which includes offenses like contempt of court, failure to appear, obstruction of justice, and probation and parole violations. *Id*. at 7.

As stated above, the Sentencing Guidelines in § 2G2.2 are harsh and outdated. There are enhancements for conduct that is present in a majority of cases. In this case, like many others, the Guidelines requires a 15-level enhancement for conduct that is not uncommon:

- 2-point enhancement because the material included minors under 12 years old (The "United States Sentencing Commission statistics show[] that, in 2009, '94.8% of child pornography sentences involved an image of a prepubescent minor.'" *United States v. D.M.*, 942 F. Supp. 2d 327, 343-44 (E.D.N.Y. 2013));

- 5-point enhancement because the offense involved the possession of 600 or more images (according to the United States Sentencing Commission, 63.1% of offenses implicate this enhancement. *Id*.; *see also United States v. Hanson*, 561 F. Supp. 2d 1004, 1010 (E.D. Wis. 2008) ("No research, study or rationale was provided for this huge increase.");

- 4-point enhancement for images showing depiction of a toddler or masochistic conduct (this is present in 73.4% of cases according to the United States Sentencing Commission. *D.M.*, 942 F. Supp. 2d at 343-44);

- 2-point enhancement for the use of a computer (according to the United States Sentencing Commission, this enhancement was applied in 95.8% of cases); and

- 2-point enhancement for knowingly engaging in distribution, when the guidelines already require a higher base offense level of 22 (rather than 18) for distribution convictions; therefore, adding 2 more levels is double counting.

If the Sentencing Commission removed even some of these enhancements for common conduct, the resulting guidelines would be closer to the mandatory minimum in many cases. For example, computers are ever-present and used for everything. Also, the speed at which computers can operate is always increasing, such that nowadays, with a few clicks, thousands of images can be downloaded in a few minutes. In addition, as stated above, the guidelines already require an enhanced base offense level for distribution convictions. Hence, in this case, if 9 points were removed for the use of the computer, the number of images, and the double counting of distribution, Mr. White's total offense level would be 25, with a resulting guideline range of 57 to 71 months. The mandatory minimum sentence of 5 years, requested here, would be within the applicable guidelines range. Therefore, a sentence of 5 years (or 60 months) is appropriate in light of the sentencing guidelines.

But even still, removing those enhancements does not fix the flawed nature of the child pornography guidelines themselves. Even the Sentencing Commission has acknowledged that the child pornography guidelines are not the product of "empirical data and national experience" but rather a reaction to Congress's push for mandatory minimum sentences. United States Sentencing Commission, *Fifteen Years of Guideline Sentencing*, at 73 (Nov. 2004) ("frequent mandatory minimum legislation and specific directives to the Commission to amend the Guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress"); *United States v. Hanson*, 561 F. Supp. 2d 1004 (E.D. Wisc. 2008); *United States v. Baird*, 580 F. Supp. 2d 889, 892

(D. Neb. 2008) ("when Guidelines are not the result of 'the Commission's exercise of its characteristic institutional role,' such as when they are not based on an empirical approach, but instead keyed to or guided by statutory directives, a court is not presented with an 'ordinary case,' in which 'the Commission's recommendation of a sentencing range will reflect a rough approximation of the sentences that might achieve 3553(a)'s objectives'"); *United States v. Johnson*, 588 F. Supp. 2d 997, 1004 (S.D. Iowa) ("because [2G2.2] does not reflect the unique institutional strengths of the Sentencing Commission in that they are not based on study, empirical research, and data, the Court affords them less deference").

### IV.  Imposing a Sentence of 60 Months' Incarceration is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. § 3553(a).

#### a. Mr. White's Personal History and Characteristics

*Mr. White's Childhood.* Mr. White was born in 1992 and before he was 2 years old, his parents divorced. PSR ¶¶57, 60, ECF No. 30. His father was awarded sole custody, and he lived with his father, grandparents, and, later, his stepmother until he was 9 years old. *Id.* ¶ 60. During that time, Mr. White also visited with his mother and stepfather. When Mr. White was 9 years old, he asked to live with his mother full time. He felt conflict with his stepmother at the time and believed he would be happier with his mother and stepfather. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████     *Id.* ¶¶ 69-70. And because of his parents' divorce and feeling like he was in the middle and something to be passed back and forth, █

████████████████████████████████████████████████

Ex. A at 3, Dr. Flower Report. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████

     Mr. White has spent his life trying to deal with what happened to him as a child. He suffers from anxiety and depression and struggles with how to think about and come to terms with the abuse he suffered. This anxiety, shame, and depression caused him to not tell anyone what happened to him until he was an adult. Meanwhile, while he was a child living with his mother and stepfather, they tried to alienate him from his father, sometimes preventing visits and other times by making negative statements about his father.

    Mr. White's mother was also emotionally abusive toward Mr. White. She abused alcohol and would threaten her own suicide to Mr. White, telling him it would be his fault if she killed herself. PSR ¶60. When Mr. White expressed that he needed something, like a hair cut or clothes for school, his mother would tell him he was ungrateful. *Id*.

The effects of abuse on a child cannot be overstated. While it does nothing to excuse the events of this case, and Mr. White would never suggest it should, it may be part of the cause or explanation for how Mr. White ended up before the Court in this case. Mr. White is haunted by what happened to him as a child and is committed to getting treatment both to help him deal with his past and deal with the impulses that brought him before the Court.

Despite the abuse he suffered, Mr. White was a dedicated student growing up, although he often struggled to make friends because he moved from school to school a lot in his early years. Mr. White enjoyed school, especially music classes. He played the clarinet in concert band and marching band and the tenor saxophone in jazz band. Mr. White's musical talents and interests continued as he got older and pursued higher education.

*Mr. White's Education and Goals.* Mr. White attended Shepherd University in West Virginia and received his bachelor's degree in music theory and composition. *Id.* ¶ 83. In college he was able to fully pursue his passion for music. He continued to participate in band, as a member of the wind ensemble, marching band, jazz band, and pit orchestras for musical theater. Mr. White went on to get his master's degree in music from Syracuse University in 2016. *Id.* After graduating, Mr. White wanted to build a career as a conductor and composer but struggled to find enough work to maintain consistent employment. Immediately after getting his masters, he got a temporary position as an adjunct music professor, teaching music theory and form and analysis (an extended music theory class that prepares students for graduate

11

school). *Id.* ¶ 86. When he started the position, he believed it would turn into a full-time position, but the faculty member that was expected to leave to open a position for Mr. White ended up staying at the university.

After leaving the university, Mr. White worked in food service and at a bank as he was researching graduate programs for conducting and determining where he wanted to live. *Id.*

*Mr. White's Tragic Accident.* On August 20, 2018, Mr. White endured a traumatic motor vehicle collision with a tractor trailer. He subsequently sustained severe bodily injuries to both his upper and lower extremities.



He also had bruises, lacerations, and abrasions throughout his body.

Mr. White's treatment at Dartmouth-Hitchcock Medical Center included a series of surgeries, x-rays to measure progress of healing, a host of medications, constant coverings/dressings on healing wounds, etc.





On September 12, 2018, Mr. White transitioned to New London Hospital for swing care. The plan for him there was to bear weight on his extremities again, continue physical and occupational therapy, and ultimately transition to acute rehabilitation. *Id*. at 9. Over the course of Mr. White's recovery, though, he was briefly admitted back to Dartmouth on November 18, 2021, █████████████████████ █████████. *Id*. at 1. After improvement, he started acute rehab at Mt. Ascutney on November 21, 2018; he remained there for approximately two weeks. His doctor outlined a plan of care emphasizing an intensive therapy program—at least three hours per day, five days per week—including physical therapy, occupational therapy, rehabilitation nursing, case management, and therapeutic recreation. *Id*. at 18. During physical therapy, Mr. White concentrated on regaining strength, enhancing

mobility, and increasing his range of motion. He steadily progressed from standing unassisted to walking with crutches, becoming less dependent on his wheelchair. In occupational therapy, he focused on fundamental daily tasks, such as managing his personal hygiene and using the toilet without assistance.

Mr. White was discharged on December 4, 2018, marking the first time he had been home in nearly four months since his accident. He was sent home with a wheelchair, crutches, and prescriptions for 18 active medications that he began at Dartmouth—the majority of which needed to be taken multiple times a day. *Id*. at 21. Given his limited endurance, he was referred for home services, with medical records noting that he was homebound and required significant effort to leave his residence, relying on both an assistive device and the support of another person." *Id*. at 20. He received in-home care with Lake Sunapee for an additional two weeks before transitioning to outpatient therapy. *Id*. at 19.

He pursued a long-term care plan for an additional month at New London Sports and Therapy. The physical and occupational therapy included Therex, Manual Rx, Neuromuscular Re-ed, Gait training, etc. *Id*. at 10, 12-17. He made great progress and received an outpatient discharge on January 24, 2019, when relocating to Syracuse, NY; he was encouraged to find a new provider and continue his recovery there. *Id*. at 11.

Mr. White had to fight to rebuild his life and regain his ability to move and live as normally as possible. During this process he was happy to have his father and

stepmother's support, and he also came to terms of the negative impact his mother had on his life. He has been estranged from his mother since this time.

Mr. White still lives with the effects of that accident today. Due to the partial amputation of his left arm, Mr. White has limited mobility in his arm. PSR ¶ 66. He also suffers from chronic nerve pain. *Id*. ¶ 65. The accident ultimately changed the course of Mr. White's life. Without full movement in his left hand, he was no longer able to conduct, and, therefore, chose not to continue to pursue graduate education. Therefore, he continued working at the bank and eventually moved to upstate New York and worked at another bank. *Id*. ¶ 86.

*The Recent Years*. Mr. White was fortunate to be awarded a settlement from the trucking company after the accident and used that to live on for the next few years. He purchased a home in upstate New York, a vehicle, and a small boat. Mr. White lived in a rural area in New York and worked seasonally as a campground caretaker in a New York State Park. *Id*. The State Park that he worked at was extremely remote and accessible via boat, which was why he purchased a small boat to permit him to get to and from the campground. The caretaking job was seasonal, so Mr. White often struggled to make ends mean in the off season.

Mr. White lived a mostly isolated life since his accident and also due to the pandemic. Ex. C at 2, Letter from Edward White ("After he recovered, he was awarded a small settlement. . . . he then purchased a house and boat in upstate NY (Long Lake). This happened during the spring of 2020 during the pandemic. At that point Kaz became even more distant from myself and my family."). Mr. White enjoyed

nature and loved his work at the campground, but it was a very solitary existence. During this time Mr. White suffered from depression. He sought some help with setting goals and dealing with his anxiety through virtual therapy during the pandemic, but he has yet to really address the root of his mental health issues, his abuse. Mr. White also abused marijuana during this period, as reported in the PSR. PSR ¶¶ 80-81.

Mr. White was grateful for his father's offer to come live with him and his stepmother during the off-season in 2023/2024. Mr. White loves his family and is very glad to have had this time with them and thankful for their support. His father describes those months fondly, nothing that Mr. White helped around the house and decorated for the holidays (including three Christmas trees). *Id.* ("The months from mid October 2023 to right before his arrest in late April of 2024 were some of the happiest moments of my life.").

*Goals for the Future and Family Support.* Mr. White is dedicated to ensuring that he will be a productive member of society upon release and that he is never again before this or any court. Mr. White is committed to receiving any treatment that is offered both at the Bureau of Prisons and in the community after his release to help him work through both his own abuse and his conduct in this case and the impulses that landed him before the Court. Mr. White's father openly and honestly expressed the same homes for his son in his letter, that Mr. White receive treatment. *Id.* at 3 ("All I am asking is that Kaz serve his time (however long that may be) at an institution that has the mental services he needs to becomes a productive and SAFE

member of society. . . . I just want him to get the help he so desperately needs. . . . No matter his sentence, this will be a years long process of healing and recovery. It won't happen all at once. But it won't happen AT ALL if he does not get the therapy and mental services that he so desperately needs.").

While in the D.C. Jail, Mr. White participated in group therapy in his unit Monday through Friday for an hour and one on one therapy once a week. In January, the therapist in his unit was removed, so he has not had the opportunity for treatment since, but he is committed to seeking out treatment in the BOP.

Mr. White's history and characteristics show: he had a very traumatic and abusive upbringing, he suffered significant and permanent injuries from a major vehicle collision in 2018, and he struggles with mental health and substance abuse issues, but he has the willingness and ability to take advantage of the silver lining of this conviction and get the mental health, substance abuse, and psychosexual treatment he needs. His history and characteristics counsel in favor of a five-year term of incarceration with a substantial period of supervised release.

### b.  Nature and Circumstances of the Offense

Mr. White accepted responsibility for this offense rather than proceeding to a jury trial. He indicated to counsel a desire to accept responsibility from the date of his arrest. The day after his arrest, Mr. White, with counsel participated in a debrief with the government where he provided access to his phone. Mr. White participated in a second debrief in May 2024 to answer additional questions from the agents.

Mr. White feels truly regretful of and embarrassed by his conduct in this case. From his first meeting with defense counsel, Mr. White has expressed sincere regret and a consistently strong desire to seek the treatment and help he may need. He has tried to get some treatment while incarcerated and intends to seek treatment in the Federal Bureau of Prisons, including mental health, substance abuse, and sex offender treatment. Mr. White's acknowledgement of his conduct and need for help, and his willingness to seek treatment, are mitigating here, ███████████████████ ███████████████████████████████████████.

The Probation Office also recommends a sentence below the applicable Guidelines Range and justifies this request because it "takes into account the defendant's specific conduct in this case, his multiple mental health diagnoses, and the need to avoid sentencing disparities among similarly situated defendants. This sentence is sufficient but not greater than necessary to provide just punishment, promote deterrence, protect the community and provide Mr. White with much needed correctional treatment." Probation Recommendation at 2, ECF No. 31.

The nature and circumstances of the offense in this case counsel in favor of a five-year sentence of incarceration, followed by a substantial period of supervised release during which Mr. White can transition back into the community with guard rails, under supervision, and connected to the treatment he is willing and eager to partake in.

### c. A 5-year Sentence Would Provide Adequate Deterrence to Criminal Conduct, Protect the Public from Further Crimes of the Defendant, Promote Respect for the Law, and Provide Just Punishment.

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant." The public will be protected while Mr. White serves a 5-year sentence and extended term of supervised release. While Mr. White's risk of recidivism is average, *see* Ex. A at 9-10, as Mr. White ages and participates in treatment, his risk will decrease. Additionally, Dr. Flower found that despite the inclusion of Mr. White in the average category, "the absence of general antisociality and prior criminality decreases his risk." *Id*. at 12.



Dr. Flower also recommended substance abuse treatment and explained that "[s]uccessful engagement in substance abuse treatment is associated with a lower risk of relapse and recidivism." *Id*. at 13. Finally, Dr. Flower noted the importance of treatment in the community: "Research shows that treatment in the community

provides a value above what can be provided by treatment in a controlled setting, because the individual is receiving treatment when they have the opportunity to relapse and are facing the challenges of abstaining in the community." *Id.*

A five-year sentence, coupled with significant conditions of supervised release, is sufficient but not greater than necessary to satisfy the purposes of punishment and is consistent with the psychological evaluation in this case.

A lengthy sentence does not have the curbing effect on crime that many assume it does. A 2017 Vera Institute of Justice analysis shows that higher levels of incarceration has diminishing returns for society:

> It may seem intuitive that increasing incarceration would further reduce crime: incarceration not only prevents future crimes by taking people who commit crime "out of circulation" (incapacitation), but it also may dissuade people from committing future crimes out of fear of punishment (deterrence). *In reality, however, increasing incarceration rates has a minimal impact on reducing crime and entails significant costs.*[4]

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things*

---

[4] Don Stemen, *The Prison Paradox: More Incarceration Will Not Make Us Safer*, July 2017, The Vera Institute of Justice, Vera Evidence Brief, https://www.vera.org/downloads/publications/for-the-record-prison-paradox_02.pdf (emphasis added); *see also* Marc Mauer, *Long-Term Sentences: Time to Reconsider the Scale of Punishment*, Nov. 5, 2018, The Sentencing Project, available at https://www.sentencingproject.org/publications/long-term-sentences-time-reconsider-scale-punishment/ ("There is also strong criminological evidence that lengthy prison terms are counterproductive for public safety as they result in incarceration of individuals long past the time that they have 'aged out' of the high crime years, thereby diverting resources from more promising crime reduction initiatives.").

*About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016). With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect. Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions."). Notably, "the great majority of studies point to a null or criminogenic effect of the prison experience on subsequent offending."[5] Hence, "[t]his reading of the evidence should, at least, caution against wild claims—at times found in "get tough" rhetoric voiced in recent decades—that prisons have special powers to scare offenders straight."[6]

The recommended sentence will also promote respect for the law and provide just punishment. First, this offense has dramatic collateral consequences that will impact the rest of Mr. White's life. Sex offender registration and sex offender supervision are far more invasive than the supervision requirements in a typical criminal case. These stringent requirements alone act as sufficient deterrence from future similar behavior. Sex offender supervision requires intensive treatment that

---

[5] Daniel S. Nagin, Francis T. Cullen, Cheryl Lero Jonson, *Imprisonment and Reoffending*, 38 Crime & Just. 115, 178 (2009).

[6] Nagin, et al., *supra* note 35.

subjects defendants to polygraph examinations. Sex offender registration requires a prohibition of residing in certain areas and informs the public of one's offense. These collateral consequences are severe and are more than sufficient to deter Mr. White. Moreover, Mr. White is actively interested in and willing to pursue treatment. Mental health, substance abuse, and psychosexual evaluation and treatment will help provide specific deterrence in this case.

In short, a lengthy sentence is not needed to deter criminal conduct in this case, protect the public, promote respect for the law, or provide just punishment.

### d. A 5-Year Sentence Also Avoids Unwarranted Sentencing Disparities.

The recommended sentence would not create unwanted sentencing disparities. As discussed in more detail above, the guideline calculation gives excessive weight to factors based on assumptions that are unfounded in general and particularly in this case, and applies "enhancements" that apply in virtually every child pornography case. Given the acknowledged issues with the § 2G2.2 guidelines, Courts have granted significant downward variances in similar cases.

Many judges in this district, including this Court, have imposed sentences well below the calculated guideline range for similar and more aggravating conduct. *See United States v. Douglas Payne*, No. 11-cr-317 (ABJ) (sentence of 60 months imposed for conduct involving travel and possession); *United States v. Gange*, No. 13-cr-38 (JEB) (defendant who distributed large quantities of photos sentenced to 46 months); *United States v. Dietterle*, No. 13-cr-80 (ABJ) (defendant who distributed pornography and discussed meeting to engage in sexual contact with minor sentenced

to 40 months); *United States v. Matthew Scanlon*, No. 14-cr-07 (RC) (sentenced to 51 months imposed despite guideline range of 87-108 months); *United States v. Steve Sollera*, No. 14-cr-225 (TSC) (sentence of 60 months imposed despite guideline range of 135-168 months); *United States v. Brian Hess*, No. 17-cr-02 (KBJ) (sentence of 60 months' imposed despite guidelines range of 151-188 months); *United States v. Downs*, No. 18-cr-391 (RJL) (defendant sentenced to 60 months incarceration, 120 months of supervised release); *United States v. Robert* Riley, No. 21-cr-404 (JDB) (sentence of 82 months impose with guidelines range of 188-235 and where defendant was the moderator of an online chat group).

Courts have also imposed a sentence of 5 years' incarceration in cases with very similar facts to the instant case.

- In *United States v. Brian Schwan*, No. 17-cr-175 (CRC), Judge Cooper imposed a sentence of 60 months imprisonment, to be followed by 120 months of supervised release, for distribution of child pornography. The defendant in that case sent 36 videos, which included videos with children as young as infants being sexually assaulted by men and women, including penetration, to an undercover agent, and chatted with the agent about arranging sex with the agent's purported 9-year-old daughter. Mr. Schwan's guidelines range was 151 to 188 months.

- In *United States v. Jason Gordon*, No. 17-cr-26 (TFH), Judge Hogan imposed a sentence of 60 months' imprisonment, to be followed by 10 years of supervised release, for distribution of child pornography. In that case, the defendant arranged to meet an undercover agent and his purported 9-year-old daughter for purposes of the defendant having sex with the agent's daughter. The defendant also sent multiple videos to the agent depicting prepubescent girls engaged in sex acts with adult men. The defendant had 300 to 400 images of child pornography on his phone. The guidelines range in that case was 135 to 168 months.

- In *United States v. Michael Jacob*, No. 17-cr-23 (JEB), Judge Boasberg imposed a sentence of 60 months' imprisonment, to be followed by 120 months of supervised release, for distribution of child pornography and travel with intent to engage in illicit sexual conduct. In that case, the defendant arranged to meet

an undercover agent and his purported 9-year-old daughter for purposes of the defendant having sex with the agent's daughter. The defendant also sent images of child pornography to the agent before the meeting and brought a cell phone and laptop with over 600 images of child pornography to the meeting for the agent to download. The guidelines range was 108-135 months.

- In *United States v. Bayo Bakare*, No. 16-cr-129 (TSC), Judge Chutkan imposed a sentence of 60 months' imprisonment, to be followed by 120 months of supervised release, for distribution of child pornography. In that case, the defendant arranged to meet an undercover agent and his purported daughter for purposes of the defendant having sex with the agent's daughter. The defendant also sent multiple videos depicting prepubescent and teenage girls being sexually abused to the agent. The guidelines range in that case was 151 to 188 months.

These cases are just a few examples that illustrate that a 60-month sentence in this case is in keeping with local and national trends and will avoid an unwarranted disparity.

## **CONCLUSION**

For the reasons stated above, Mr. White respectfully requests that the Court impose a sentence of 60 months' incarceration, the mandatory minimum sentence in this case.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

By:          /s/
          Diane Shrewsbury
          Assistant Federal Public Defender
          625 Indiana Avenue, N.W., Suite 550
          Washington, D.C. 20004
          (202) 208-7500